**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Oscar SMITH, Regina Smith and Gary King, Defendants–Appellants,**

**Julia Thom, Defendant.**

No. 89–8195.

United States Court of Appeals, Eleventh Circuit.

Dec. 14, 1990.

Frank K. Martin, Columbus, Ga., for O. Smith.

Kenneth W. Musgrove, Albany, Ga. (Court–appointed), for R. Smith.

Michael Kennedy McIntyre, Atlanta, Ga., for G. King.

Deborah A. Griffin, Asst. U.S. Atty., Charles Calhoun, Macon, Ga., for U.S.

Before EDMONDSON and BIRCH, Circuit Judges, and Re *, Chief Judge.

BIRCH, Circuit Judge:

This case involves a large-scale conspiracy to import and distribute cocaine from Panama within the United States. The principal evidence against defendants-appellants at trial was the testimony of a former coconspirator who became a government informant. Defendants-appellants challenge their convictions on numerous grounds. After reviewing the record, we affirm.

* Honorable Edward D. Re, Chief Judge of the U.S. Court of International Trade, sitting by

## I. FACTUAL AND PROCEDURAL BACKGROUND

The individuals involved in this cocaine importation conspiracy included Jackie Lee Bigelow, who became a government informant. Bigelow served in the United States Army at Fort Kobbe, Panama, from December 12, 1981, until April 9, 1986, when he was discharged. Prior to his discharge, Bigelow met codefendant Ricardo Brown, leader and organizer of a cocaine importation operation. Brown and Bigelow plotted the details of their cocaine importation scheme.

Their original plan entailed Bigelow's traveling to Panama to obtain an unspecified amount of cocaine, and leaving through the Military Airlift Command (MAC) terminal. To accomplish the departure from Panama via the MAC terminal, Bigelow was to impersonate military personnel, requiring a uniform, military leave pass, and identification card. Brown directed Bigelow to duplicate his military identification card before returning to his home in Doerun, Georgia, to await further instructions.

Shortly after his army discharge, Bigelow returned to Panama to meet with Brown. Brown provided Bigelow with a military leave pass, which, together with a uniform and his identification card, enabled Bigelow to depart from Panama through the MAC terminal. Brown also gave Bigelow $500 and a duffle bag containing cocaine, with instructions to deliver the contents to an address in Brooklyn, New York. When he arrived at the MAC terminal, Bigelow was joined by two men who were transporting similar duffle bags to the same Brooklyn address.

The three men flew from Panama to Fort Meade, Maryland, to New York, where they delivered the duffle bags to codefendant-appellant Oscar Smith. After receiving the cocaine, Smith paid each courier $25,000 in cash. The next day, Bigelow returned to Doerun, Georgia, and awaited additional instructions.

designation.

In June, 1987, Brown contacted Bigelow regarding another trip to Panama to import cocaine. On this trip, Bigelow was accompanied by his friend, codefendant-appellant Gary King. The two men flew to Panama to meet Brown, who provided them with leave passes, duffle bags containing cocaine, and $500 each. Bigelow and King left Panama through the MAC terminal. After stopping briefly at Kelly Air Force Base in Texas, the two men flew to New York, where they delivered the cocaine to Oscar Smith and his wife, codefendant-appellant Regina Smith.[1] Oscar Smith paid each courier $25,000.

Bigelow testified at trial that the same procedure for obtaining cocaine from Panama and delivering it to the United States was followed in August, 1987, November, 1987, January, 1988, and April, 1988. He stated that he was accompanied by King and John Turner on the November, 1987 trip and that the cocaine was delivered to codefendant Tino Lee, who also received the cocaine from the January, 1988 trip.

While Bigelow was in Panama for the April, 1988 trip, he and Brown decided to vary the procedure for smuggling cocaine out of the country. Bigelow suggested that the cocaine be mailed from Panama to an address in Doerun, Georgia. Brown and Bigelow packaged nine kilograms of cocaine and mailed it to the address of codefendant Maxine Williams in Doerun, Georgia. When the package arrived, Bigelow took it to Brooklyn, New York, and delivered it to Oscar Smith, who paid him $13,000 for the delivery.

In May, 1988, Bigelow received a package containing eight kilograms of cocaine mailed from Panama to Doerun, Georgia. Bigelow placed the package in his suitcase and was en route to the airport on May 24, 1988, when he was stopped for driving with a suspended license in Colquitt County, Georgia. Thinking that the officer might search the vehicle, Bigelow volunteered that he had eight kilograms of cocaine in the car. Bigelow was arrested and subsequently agreed to cooperate with the authorities. He detailed his role as a drug courier in a major scheme to import cocaine into the United States from Panama.

As part of his agreement with the government, Bigelow consented to make several recorded telephone calls to codefendant Oscar Smith. Pursuant to one of these conversations, Oscar Smith wired $1,000 to Bigelow, who had requested the money because he was in custody for driving with a suspended license. In another conversation, Bigelow informed Oscar Smith that he had received another cocaine package, but that he was concerned about delivering the cocaine because he believed that the authorities were watching him. After additional calls, Bigelow asked Oscar Smith to send someone, wearing a gold chain owned by Oscar Smith, to Georgia to obtain the cocaine.

Codefendants Regina Smith and Julia Thom subsequently flew from New York to Georgia to procure the cocaine and deliver it to Oscar Smith in New York. Wearing the identifying gold chain, Regina Smith and Thom met Bigelow in a Moultrie, Georgia hotel room to discuss delivery of the cocaine. Regina Smith and Thom were arrested there.

Bigelow and Oscar Smith also used John Turner, who was a government informant and pled guilty to conspiracy to possess with intent to distribute cocaine, as a courier in their operation. At trial, Turner testified that he was employed by the United States Army, stationed in Ecuador, South America. While in Ecuador, Turner met Brown who explained that Turner easily could make $25,000 by delivering cocaine from Panama to the United States.

While on leave in Panama in September, 1987, Turner contacted Brown, who took Turner and Herberto Lynton to the Salvoy Hotel. During his stay at the Salvoy Hotel, Turner was introduced to Bigelow. Brown, Bigelow and Turner discussed a cocaine importation trip from Panama to the United States, and Bigelow explained to Turner the procedure for passing through security at the MAC terminal.

---

1. The testimony revealed that Regina Smith and Bigelow were having an affair.

Bigelow, Brown, Lynton and Turner arrived at the MAC terminal, where codefendant Alex Smith met them and provided duffle bags containing cocaine. Alex Smith supplied each man with $300 for travel expenses and explained that the cocaine was wrapped so that it could not be detected by dogs. Lynton, Turner and Bigelow successfully flew from Panama to Dobbins Air Force Base in Marietta, Georgia, where they obtained a commercial flight to New York.

In New York, Bigelow contacted Oscar Smith. The three men delivered the cocaine to Oscar Smith. The men were taken to meet "Tino," codefendant Faustino Lee, who paid them for their courier services. Turner received $25,000 in cash.

In November, 1987, Turner returned to Panama, where Brown asked him to undertake a second cocaine importation trip. On this trip, Turner was accompanied by Bigelow and King, who initially was introduced to Turner as "Wayne Williams." [2] Turner described this trip as essentially identical to the previous one: the men flew from Panama to Texas and New York, where they delivered the cocaine and were paid for their services.

Defendants-appellants Oscar Smith, Regina Smith, Gary King, and other members of the cocaine importation conspiracy were charged in a twenty-seven count indictment in the Middle District of Georgia with various drug offenses, including conspiracy to import, possess and distribute 162 kilograms of cocaine, and the use of the telephone, interstate transportation and the mail to facilitate a drug felony. Defendants Jackie Bigelow, Ricardo Brown, Maxine Williams and Brenda McGee pled guilty. Defendants Fersdon (Alex) Smith and Faustino (Tino) Lee remain fugitives. Defendants Oscar Smith, Regina Smith, Gary King and Julia Thom proceeded to trial and were convicted.[3] Oscar Smith was convicted on counts involving conspiracy to import, possess and distribute 162 kilograms of cocaine, and the use of the

telephone, interstate transportation and the mail to facilitate a drug felony; he was sentenced to serve 292 months in prison. Regina Smith was convicted on counts involving conspiracy to possess and interstate transportation of cocaine; she was sentenced to serve 151 months in prison. Gary King was convicted on counts involving conspiracy to import and distribute 162 kilograms of cocaine, and the use of interstate transportation to facilitate a drug felony; he was sentenced to serve 188 months in prison. The respective sentences were imposed on defendants-appellants under the Sentencing Guidelines; they presently remain incarcerated.

## II. DISCUSSION

Defendants-appellants individually have raised numerous claims on appeal. Most of these contentions are either frivolous or procedurally defaulted. Only certain arguments for each defendant-appellant warrant discussion, and we will confine our analysis to those issues.

### A. Oscar Smith

■ Defendant-appellant Oscar Smith contends that the district court should have granted his motion for change of venue from the Middle District of Georgia to the Southern District of New York. A transfer of venue is completely within the discretion of the trial court and the decision to deny a change of venue request will be reversed only for abuse of discretion. *United States v. Kopituk*, 690 F.2d 1289, 1322 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300; 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300; 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Pry*, 625 F.2d 689, 691 (5th Cir.1980) (per curiam), *cert. denied*, 450 U.S. 925, 101 S.Ct. 1379, 67 L.Ed.2d 355 (1981). Under 18 U.S.C. § 3237(a), any offense committed in more than one district may be "prosecuted in any district in which such offense was begun,

---

2. At trial, Turner identified King as the person with whom he travelled from Panama to Texas to New York in November, 1987. R8–1010.

3. Although defendant Julia Thom appealed, her appeal subsequently was dismissed.

continued, or completed," and "[a]ny offense involving use of the mails, transportation in interstate or foreign commerce, or the importation of an object ... into the United States is a continuing offense and ... may be ... prosecuted in any district from, through, or into which such commerce, mail matter, or imported object ... moves."

█ In a conspiracy case, venue is proper in any district where an overt act was committed in furtherance of the conspiracy. *Hyde v. United States,* 225 U.S. 347, 363, 32 S.Ct. 793, 800, 56 L.Ed. 1114 (1912); *United States v. Long,* 866 F.2d 402, 407 (11th Cir.1989). The government must support its choice of venue "only by a preponderance of the evidence." *United States v. Shearer,* 794 F.2d 1545, 1551 (11th Cir.1986); *United States v. London,* 714 F.2d 1558, 1564 & n. 9 (11th Cir.1983); *see United States v. Barnes,* 681 F.2d 717, 722 (11th Cir.1982) (The prosecution must prove territorial jurisdiction and venue, essential elements of any offense, by a preponderance of the evidence rather than beyond a reasonable doubt.), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983). This court reviews a challenge to venue in the light most favorable to the government, and makes all reasonable inferences and credibility choices in favor of the jury verdict when deciding whether the government has proved by a preponderance of the evidence that an offense occurred in the trial district. *United States v. Burroughs,* 830 F.2d 1574, 1580 (11th Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); *United States v. Brantley,* 733 F.2d 1429, 1433 (11th Cir. 1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). Upon the motion of a defendant, it is incumbent upon the district court to transfer the trial, if the court is satisfied that "so great a prejudice against the defendant" exists in the district where the case is pending "that the defendant cannot obtain a fair and impartial trial" there. Fed.R.Crim.P. 21(a).

█ In this case, the crimes of conspiracy to import, possess and distribute cocaine clearly occurred in the Middle District of Georgia. When apprehended in the Middle District of Georgia, Jackie Bigelow possessed cocaine that was mailed from Panama. His possession is imputed to all members of the conspiracy. *See United States v. Marable,* 574 F.2d 224, 230 (5th Cir.1978) (Once involved with a conspiracy and without withdrawal, a conspirator is responsible for any later act of a coconspirator that is a necessary or natural consequence of the conspiracy.); *see also United States v. Obregon,* 893 F.2d 1307, 1311 (11th Cir.) ("The government need not prove that each alleged conspirator knew all the details of the conspiracy. The government provides sufficient proof of knowledge by demonstrating the conspirator knew of the essential purpose of the conspiracy."), *cert. denied,* — U.S. —, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). Oscar Smith failed to establish adequately that he would be so prejudiced by the trial of his case in the Middle District of Georgia that he would not receive a fair trial there. We conclude that the district court did not abuse its discretion by denying Oscar Smith's motion to transfer venue to the Southern District of New York.

█ Oscar Smith also claims that he was entrapped or linked to the cocaine importation conspiracy by admission into evidence of his recorded telephone conversations with Bigelow, and that he could not conspire with Bigelow, who had become a government informant. "Where a defendant is predisposed to commit a crime, he cannot be entrapped, regardless of how outrageous or overreaching the government's conduct may be." *United States v. Rey,* 811 F.2d 1453, 1455 (11th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987); *see Hampton v. United States,* 425 U.S. 484, 488–91, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 428–36, 93 S.Ct. 1637, 1641–45, 36 L.Ed.2d 366 (1973). There is no dispute that Oscar Smith and Bigelow made telephone calls regarding cocaine importations from Panama, and deliveries to Oscar Smith in New York, before Bigelow became a government informant. As his past conduct demonstrated, Oscar

Smith had one goal in his recorded conversations with Bigelow: to obtain the Panamanian cocaine in Bigelow's possession. Oscar Smith plainly was predisposed to commit the crime and cannot find shelter in a claim of entrapment.

■ The admission into evidence of recorded conversations between a defendant and a consenting government informant does not violate the Fourth Amendment right of the accused. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *see United States v. Davanzo*, 699 F.2d 1097, 1100 (11th Cir. 1983) (When an informant consents to the recording of a conversation, no warrant is required.). This court has analyzed the admissibility of a videotaped conversation between a codefendant and a government informant in a cocaine importation conspiracy and found the statements of the cocon-

spirator to be admissible as made in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E), and reviewable as a factual finding under the clearly erroneous standard.[4] *United States v. Byrom*, 910 F.2d 725, 734 (11th Cir.1990); *see Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Decisions, which have held that a coconspirator involved in an existing conspiracy has been implicated by statements made to a government informant, have been influenced by the coconspirator's subsequent independent actions confirming the statements made in the subject conversation.[5] The record in this case contains sufficient evidence of Oscar Smith and Bigelow's participation in the cocaine importation conspiracy prior to Oscar Smith's recorded telephone conversations with Bigelow after Bigelow became an informant. Oscar Smith's concern with obtaining the cocaine

4. In *United States v. Byrom*, 910 F.2d 725 (11th Cir.1990), a coconspirator in a cocaine importation conspiracy was video/audiotaped conferring with a government informant. Their discussion references another coconspirator and his involvement with a future cocaine importation trip, which never occurred. This court found that the videotaped conversation was admissible against both coconspirators as statements of a conspirator made in furtherance of the conspiracy under Rule 801(d)(2)(E) of the Federal Rules of Evidence. The court reached that conclusion by: 1) recognizing that this circuit applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy, *id.* at 735; *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989); *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir.1988), and 2) finding sufficient evidence independent of the videotape to implicate the two coconspirators, *Byrom*, 910 F.2d at 736; *see Bourjaily v. United States*, 483 U.S. 171, 180–81, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). Similarly, we find ample evidence in the record to support Smith's conviction for his participation in this cocaine conspiracy independent of the recorded telephone conversations.

5. *See, e.g., Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2782 (A taped conversation between an informant and a coconspirator referred to a "friend" who would be waiting in a parking lot for the transfer of cocaine. The "friend's" appearance at the parking lot and receipt of the cocaine showed that the coconspirator and the "friend" were involved in a conspiracy and that the tape properly was admitted against the "friend", petitioner Bourjaily.); *Santiago*, 837 F.2d at 1549

(An informant's advice, based on a coconspirator's information, that two women carrying cocaine would arrive at the Atlanta airport was considered to be a statement in furtherance of the conspiracy, when the women, transporting cocaine, arrived at the airport on the designated airplane and attired in the described clothing. The informant's testimony was instrumental in the women's convictions.); *see also United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989) (In an antitrust bidrigging conspiracy, the district court properly admitted the testimony of an employee from a conspiring company that he received an anonymous telephone call concerning the bidding the morning that the bids were received. The court admitted the telephone call in furtherance of the conspiracy because, on the preceding night, the testifying employee had attended a meeting at which he was told that he would receive a call if the conspirators agreed on the price, and the employee rigged the bid for his company based on the information that he received from the telephone caller.); *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989) (The British police's recording defendant's conversation with an intimate female acquaintance in a London hotel room during which the risks of cashing a check, the level of payment for the conspirators and the method of transporting the money to the United States were found to be statements in furtherance of the conspiracy to transport stolen securities in interstate commerce for which the defendant was convicted.).

in Bigelow's possession, the subject of his recorded telephone conversations, subsequently resulted in his sending his wife, wearing his identifying gold chain, and Julia Thom to Georgia to acquire the cocaine.

■ This court alternatively has recognized that an informant's statements are admissible not for the truth of the matter asserted, but for the purpose of placing a conspirator's comments in context for the jury. *Byrom,* 910 F.2d at 737; *United States v. Price,* 792 F.2d 994, 997 (11th Cir.1986). Other circuits have permitted the admission of such statements for the purpose of making responses intelligible for the jury as well as making them recognizable as adoptive admissions. *See, e.g., United States v. Gutierrez–Chavez,* 842 F.2d 77, 81 (5th Cir.1988); *United States v. Lemonakis,* 485 F.2d 941, 948–49 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974). Therefore, Oscar Smith's allegation of entrapment is defeated and the admission of his recorded conversations upheld under the clearly erroneous standard by his predisposition to obtain the cocaine possessed by Bigelow, statements made in furtherance of the conspiracy pursuant to Rule 801(d)(2)(E), and the contextual rationale. His remarks are admissible against him and his coconspirators as evidence of the ongoing conspiracy despite Bigelow's informant status.

## B. Regina Smith

■ Defendant-appellant Regina Smith argues that the district court erred in denying her motion for severance because of the prejudice accruing to her from the evidence presented against the other conspirators, and because the joint trial precluded her from obtaining exculpatory statements from her husband-codefendant Oscar Smith and codefendant Gary King.[6] When it appears that a defendant is prejudiced by joinder of offenses or defendants in an indictment or by a joint trial, a district court may grant a severance. Fed.R. Crim.P. 14; *see United States v. Alvarez,* 755 F.2d 830, 857 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235

(1985), 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 380 (1987). Nevertheless, because of the "well-settled principle that it is preferred that persons who are charged together should also be tried together," particularly in conspiracy cases, the denial of a motion for severance will be reversed only for abuse of discretion. *United States v. Morales,* 868 F.2d 1562, 1571 (11th Cir. 1989); *United States v. Gonzalez,* 804 F.2d 691, 694 (11th Cir.1986) (per curiam); *see United States v. Van Horn,* 789 F.2d 1492, 1505 (11th Cir.) ("A motion for severance is a matter within the sound discretion of the district court."), *cert. denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123, 479 U.S. 855, 107 S.Ct. 192, 93 L.Ed.2d 124, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 255 (1986). "Rule 14 requires the district court to balance the right of defendants to a fair trial, absent the prejudice inherent in a joint trial, against the interests of judicial economy and efficiency." *Gonzalez,* 804 F.2d at 694; *see United States v. Harris,* 908 F.2d 728, 736 (11th Cir.1990); *United States v. Butler,* 792 F.2d 1528, 1534 (11th Cir.), *cert. denied,* 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986); *Alvarez,* 755 F.2d at 857.

■ To establish that the district court abused its discretion in denying a motion for severance, an appellant must demonstrate "that he suffered compelling prejudice against which the trial court could offer no protection." *Morales,* 868 F.2d at 1571 (quoting *United States v. Magdaniel–Mora,* 746 F.2d 715, 718 (11th Cir.1984)); *United States v. Bryan,* 843 F.2d 1339, 1341 (11th Cir.1988). "The test for assessing compelling prejudice is whether it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct, and, if possible, severance should not be granted." *United States v. Silien,* 825 F.2d 320, 323 (11th Cir.1987) (per curiam); *see United States v. Marszalkowski,* 669 F.2d 655, 660 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982); *see also*

---

**6.** Oscar Smith did testify at trial; Gary King did not testify.

*United States v. Barnette,* 800 F.2d 1558, 1570 (11th Cir.1986) (per curiam) (Any prejudice in a joint trial can be cured by the district court's cautionary instructions: " 'The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction.' " (quoting *United States v. Morrow,* 537 F.2d 120, 136 (5th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977))), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 769 (1987).

In our evaluation of compelling prejudice, we consider all the circumstances of a particular case "to determine whether the court's instructions sufficiently enabled the jurors to keep separate the evidence as relevant to each defendant." *Harris,* 908 F.2d at 736–37; *see United States v. Roper,* 874 F.2d 782, 789 (11th Cir.), *cert. denied,* ── U.S. ──, 110 S.Ct. 189, 107 L.Ed.2d 144, ── U.S. ──, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). Although particular coconspirators may not have been present at each stage of the conspiracy, a district court's cautionary instructions, which admonish the jury to consider separately each defendant's guilt, obviate the probability of a spillover effect. *United States v. Johnson,* 713 F.2d 633, 640 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *see United States v. LaChance,* 817 F.2d 1491, 1497 (11th Cir.), *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987) (A defendant complaining that he was disadvantaged by a joint trial specifically "must show compelling prejudice caused by the alleged evidentiary spillover, which effectively precluded the jury's ability to make the necessary individualized determination.").

▆▆▆▆ Compelling prejudice is established by demonstrating that the jury could not follow the district court's instructions and apportion the evidence relevant to the respective defendants. *United States v. Leavitt,* 878 F.2d 1329, 1340 (11th Cir.), *cert. denied,* ── U.S. ──, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *United States v. Dorsey,* 819 F.2d 1055, 1058 (11th Cir.1987),

*cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988). If a defendant participated in one aspect of a conspiracy and is tried with coconspirators, then severance necessarily is not warranted because it is presumed that the court's cautionary instructions regarding each defendant adequately will guard against prejudice. *Leavitt,* 878 F.2d at 1340; *see United States v. Pepe,* 747 F.2d 632, 650 (11th Cir.1984); *United States v. Kopituk,* 690 F.2d 1289, 1320 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300, 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). A defendant-appellant does not incur compelling prejudice because of the likelihood of his acquittal if he had been tried separately or because much of the trial evidence is applicable to his codefendants. *Alvarez,* 755 F.2d at 857; *see United States v. Kabbaby,* 672 F.2d 857, 861–62 (11th Cir.1982) (per curiam). Conclusory assertions regarding lack of participation in the subject conspiracy, without specific exonerative facts, are ins to support a motion for severance. *See Johnson,* 713 F.2d at 641; *United States v. DeSimone,* 660 F.2d 532, 540 (5th Cir. Unit B Nov. 1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982). Moreover, convictions invariably are sustained when "it may be inferred from the verdict that the jury 'meticulously sifted the evidence,' " by acquitting on particular counts indicating an individual assessment of the guilt of each defendant. *United States v. Hewes,* 729 F.2d 1302, 1319 (11th Cir.1984) (quoting *Kabbaby,* 672 F.2d at 861), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985).

▆▆▆▆ In this circuit, a defendant's severance motion based on the need for a codefendant's testimony must demonstrate: "(1) a bona fide need for the codefendant's testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) that the codefendant will actually testify." *Leavitt,* 878 F.2d at 1340 (citing *Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir.1970)); *Hewes,* 729 F.2d at 1319. If this showing is made, then the

district court must determine "the significance of the testimony, the prejudice caused by the absence of the testimony, the timeliness of the motion and the effect on judicial administration and economy of resources." *Leavitt*, 878 F.2d at 1340. The district court's denial of a severance motion based on the need for a codefendant's testimony is reviewed only for abuse of discretion. *Id.*

 In reviewing the motion for severance by Regina Smith and Julia Thom, we note that these defendants simply allege prejudice if tried with the other defendants. Attached to the severance motion is their attorney's affidavit stating that Regina Smith was indicted on fourteen counts of a twenty-seven count indictment; that the acts of the other defendants greatly exceed her actions; that Regina Smith's defense may be presented in a shorter time than the defenses of the other defendants; that the jury may not be able to segregate the evidence relating to separate offenses in the case; that prejudice may occur through codefendants' statements or confessions which could not be remedied by limiting instructions; and that Regina Smith would be exonerated by the testimony of other codefendants who may refuse to testify in a joint trial. In denying the severance motion by defendants Regina Smith and Julia Thom, the district court, recognizing the preference for joint trials, stated that the defendants had failed to show that joinder with other defendants would prejudice them unduly or that any prejudice could not be cured by a cautionary instruction. We find the undocumented, conclusory allegations of the severance motion to be insufficient to overcome our strong circuit precedent favoring joint trials. In particular, the motion and accompanying affidavit fail to specify which codefendants' testimony would exonerate Regina Smith, the substance of such testimony, the exculpatory nature and effect of the testimony, or whether the unnamed codefendants would testify if a severance were granted.

Furthermore, the district court, after instructing the jury on the relevant law, delivered the following cautionary instruction:

Now, I want to make it clear to you that just because you find some one defendant guilty doesn't mean you've got to find some other defendant guilty. Each defendant is entitled to a separate consideration of his or her case. Also, just because you find some defendant guilty on some one or more counts doesn't mean you've got to find that defendant guilty on other counts. And just because you may find him not guilty on some one or more counts doesn't mean you've got to find him not guilty on other counts. We want a verdict on each count. And it can be—all of them can be guilty, all of them can be not guilty or some of them can be guilty and some of them can be not guilty. We want a verdict on each count.

R11–1598–99. This instruction properly admonished the jury to consider the participation of each defendant in the cocaine importation conspiracy and precluded the possibility of spillover effect. Because Regina Smith was married to Oscar Smith, and had an intimate relationship with Bigelow, both of whom were critical links in the conspiracy chain, and because she wore the identifying gold chain when she arrived in Georgia, the jury could well have been convinced by the testimony in this case that Regina Smith was knowledgeable of the cocaine importation operation, although her participation was less than that of other conspirators. The jury convicted Regina Smith on three counts, indicating their ability to isolate and assess her involvement in the overall cocaine importation scheme. In our review of all the circumstances of this case, we conclude that the district court did not abuse its discretion in denying the severance motion as to Regina Smith and presented the jury with an appropriate cautionary instruction regarding their evaluation of the involvement of each defendant.

C. Gary King

 Defendant-appellant Gary King contests certain closing remarks by the

prosecutor.[7] The statements of a prosecutor will justify reversal of a conviction if they undermined " 'the fairness of the trial and contributed to a miscarriage of justice.' " *United States v. Obregon*, 893 F.2d 1307, 1310 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990) (quoting *United States v. Sawyer*, 799 F.2d 1494, 1507 (11th Cir.1986) (per curiam)), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987); *see United States v. Rodriguez–Suarez*, 856 F.2d 135, 139 (11th Cir.1988) ("Prosecutorial misconduct during closing argument does not require reversal unless the comments are both improper and prejudicial to a substantial right of the defendant."), *cert. denied,* 488 U.S. 1045, 109 S.Ct. 875, 102 L.Ed.2d 998 (1989). We review allegedly improper comments by the prosecutor on the particular facts of the case and in the context of the entire record. *Obregon,* 893 F.2d at 1310. Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered. *See United States v. Barshov*, 733 F.2d 842, 847 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985); *see also Springer v. Wal–Mart Assocs.' Group Health Plan*, 908 F.2d 897, 901 (11th Cir.1990) ("Counsel's closing argument, of course, is not competent evidence."). In this case, the district court properly instructed the jury that opening and closing statements by counsel were not evidence in the case.[8]

King has complained that the prosecutor attempted to divert the jury from its task of determining his guilt or innocence by enlisting the jury in the government's war against drugs with the following comments: "This is not a nuclear war. This is a war on drugs. And Oscar Smith is symbolic of the enemy." R11–1527. We note that the prosecutor's closing argument followed that of Oscar Smith's counsel, who compared the government's prosecution of this case throughout his closing argument to "an atomic bomb approach." R11–1503; *see id.* at 1505, 1508, 1512, 1516–17. Defense counsel's analogy " 'was clearly an invitation to the prosecutor to protest to the contrary.' " *United States v. Bascaro*, 742 F.2d 1335, 1353 (11th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613; 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613; 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985) (quoting *United States v. Eley*, 723 F.2d 1522, 1526 (11th Cir.1984)). "When the prosecutor goes no further than to take defense counsel up on his invitation, his conduct will not be regarded as impermissibly calculated to incite the passions of the jury." *Bascaro,* 742 F.2d at 1353; *see Knight v. Dugger*, 863 F.2d 705, 741 (11th Cir.1988).

▅▅▅ Closing arguments in this case consumed two days. On the first day, the prosecutor explained to the jury the presumption of innocence for each defendant, and King's counsel referred to those comments made by the prosecutor in his closing argument. R10–1413, 1466. Prosecu-

---

**7.** Among the prosecutor's closing remarks challenged by King is a statement that the government informants, Bigelow and Turner, "put their lives on the line" by testifying against the defendants, including King. R11–1538. King argues that this statement described King as a bad and dangerous person, when he had not placed his character in issue. Because the district court thereafter instructed the jury to disregard the statement at the request of Oscar Smith's counsel, we find King's claim of prejudice by this comment of the prosecutor to be without merit.

**8.** The district court instructed the jurors regarding their consideration of the counsels' opening and closing statements as follows:

> What the lawyers said to you in the opening statements last Tuesday—not yesterday, Tues-

> day a week ago—is not evidence. What they have said to you in their closing arguments yesterday afternoon and this morning is not evidence. That's the lawyers talking about the evidence. Sometimes lawyers don't remember the evidence the way you do. If their recollection of the evidence is different from yours, you take your recollection. I'm not telling you not to pay attention to what the lawyers have said, but I'm just drawing a distinction between the way the lawyers remember it and talk about it and the way you might remember and talk about it.
>
> As I have said, you will consider only the evidence in the case.

R11–1553.

torial appeals for the jury to act as "the conscience of the community" are not impermissible when they are not intended to inflame. *United States v. Kopituk,* 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300; 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300; 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In the context of the proceeding, the closing argument by Oscar Smith's counsel, and the initial remarks of the prosecutor and King's counsel, we are unpersuaded that King was prejudiced by the prosecutor's responsive comments.[9] *See Bascaro,* 742 F.2d at 1353–54 ("The United States Attorney's likening the drug problem to a war or enemy invasion, coupled with his statement that he was interested in justice and not convictions for their own sake, could fairly be described as little more than a response to defense counsel's suggestion that the defendants' prosecution was a show put on by government counsel for their own amusement.").

■ Additionally, King claims that the prosecutor's remark that "[w]e don't have to buy those four defendants' lies" was an unconstitutional comment on King's choice not to testify. R11–1545. "The test for determining whether a statement made in court is a comment on the failure of a defendant to testify is whether the statement was either 'manifestly intended or was of such character that a jury would rationally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Dorsey,* 819 F.2d 1055, 1061 (11th Cir.1987), *cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988) (quoting *United States v. Countryman,* 758 F.2d 574, 578 (11th Cir.1985)); *see United States v. Watson,* 866 F.2d 381, 386 (11th Cir.1989). This standard is applied by examining "the com-

ment in context to evaluate the motive behind the statement and its impact on the jury." *Dorsey,* 819 F.2d at 1061; *see United States v. Watkins,* 811 F.2d 1408, 1412 (11th Cir.) (per curiam), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987).

In *Dorsey,* the prosecutor's closing argument referred to Dorsey's testimony; Dorsey did not testify. This court found that the prosecutor's reference was accidental and that the innocuous nature of the comment was demonstrated by defense counsel's failure to object. When there is no objection and the remark is not so grossly prejudicial that it cannot be remedied by an objection or instruction, the challenged prosecutorial statement is reviewed under the lenient plain error standard. *Dorsey,* 819 F.2d at 1062 n. 4 (*citing United States v. Griggs,* 735 F.2d 1318, 1324 (11th Cir. 1984) (per curiam)). The prosecutor's statement in *Dorsey* was determined to be "clearly harmless." 819 F.2d at 1062 n. 4.

The challenged remark in this case occurred at the end of the prosecutor's closing argument prior to the judge's jury instructions. Defense and prosecution counsel had offered their characterization of the testimony and evidence presented at trial. None of the defense counsel objected to the prosecutor's closing remark. Moreover, it could "reasonably be viewed as a comment on logical inferences from all of the evidence rather than an argument requiring a negative inference from the defendant's failure to testify." *United States v. Rutkowski,* 814 F.2d 594, 597 (11th Cir.1987) (per curiam). Therefore, we conclude that the prosecutor's statement was harmless to King and not improper. *Id.*

■ King also contends that the district court incorrectly charged the jury on the Travel Act, 18 U.S.C. § 1952.[10] " 'This

---

9. Similarly, we find no merit to King's complaints that the prosecutor impermissibly vouched for the testimony of the government informants. The credibility of the informants had been attacked by defense counsels' closing arguments, and the prosecutor supported the informants' testimony by record evidence. *See United States v. Fuentes,* 877 F.2d 895, 900–01 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct.

347, 107 L.Ed.2d 335; —— U.S. ——, 110 S.Ct. 516, 107 L.Ed.2d 517 (1989).

10. Violation of the Travel Act consists of the following offenses:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

Court will not reverse a conviction unless, *after examining the entire charge*, the Court finds that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process.'" *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir.1990) (emphasis added) (quoting *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989)). In our review of the entire charge, " 'isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial.' " *United States v. Gold*, 743 F.2d 800, 822 (11th Cir.1984) (quoting *United States v. McCoy*, 539 F.2d 1050, 1063 (5th Cir.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977)), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985). The district court instructed the jury regarding the Travel Act as follows:

> Title 18 of the United States Code, Section 1952, makes it a federal crime for anyone to travel in interstate commerce for the purpose of carrying on certain unlawful activities. The defendant whose case you are considering at the moment can be found guilty of that offense only if all of the following acts are proved beyond a reasonable doubt. First, that the defendant whose case you are considering at the moment traveled in interstate commerce on or about the time alleged and between the places charged in the indictment. Second, that the defendant engaged in that travel with the specific intent to promote, manage, establish or carry on an unlawful activity, as hereafter defined. And, third, that the defendant thereafter knowingly and willfully committed an act to promote, manage, establish or carry on such unlawful activity. Those three things.

> Now, in connection with this, I charge you that the term "interstate commerce" means transportation or movement between one state and another state. That's what interstate commerce means, from one state to another state. And while it must be proved that the defendant traveled in interstate commerce, with the specific intent to promote, manage, establish or carry on an unlawful activity, it need not be proved that such purpose was the only reason or motive promoting the defendant's travel. Now, the term "unlawful activity" includes the possession with intent to distribute cocaine.

> So the indictment charges that the defendants named in those counts traveled in interstate commerce with the intent to promote, manage, establish or carry on an unlawful activity. However, the law is worded in the disjunctive. That is, the various modes or methods of violating the statute are separated by the word "or." So if you find beyond a reasonable doubt that any one method or way of violating the law occurred, that is sufficient so long as you agree unanimously upon the particular way or method involved.

> So you will tell us by your verdict on these travel counts—travel counts being 23 and 24—whether the defendants who are named in those counts—that is, the defendants who are before you for your consideration—are guilty or not guilty on those counts.

R11–1586–88. We note that the district court's instruction contains the essential elements which constitute a violation of the Travel Act and that the defense did not request a definition of "business enterprise." King faults the court's instruction because it did not define "business enterprise" as being continuous conduct rather than occasional involvement in illegal activity.

> (1) distribute the proceeds of any unlawful activity; or
> (2) commit any crime of violence to further any unlawful activity; or
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, manage-
> ment, establishment, or carrying on, of any unlawful activity,
> and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3)....
> 18 U.S.C. § 1952(a).

"The Travel Act does not define the term 'enterprise,' and the case law simply describes it generally as 'a continuous course of conduct, rather than a sporadic, casual course of events.'" *United States v. Corona*, 885 F.2d 766, 771 (11th Cir.1989) (quoting *United States v. Lignarolo*, 770 F.2d 971, 979 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986)), *cert. denied*, ─── U.S. ───, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990). Although one unlawful drug transaction has been established, convictions have been sustained under the Travel Act when a continuous course of conduct was found. *United States v. Bates*, 840 F.2d 858, 863 (11th Cir.1988); *see United States v. Davis*, 666 F.2d 195, 202 (5th Cir. Unit B 1982) ("[O]ne methaqualone transaction was proved, but the evidence as a whole showed that … [the defendants] had for some time engaged in a continuous business relationship in illegal drug trafficking."). We, therefore, find no error in the district court's instruction and that the jury properly could convict King under the Travel Act for his participation in an ongoing, profitable cocaine importation operation.

■■ King's final claims, which we accord brief discussion, relate to his sentencing. First, King argues that the district court was unaware that it could sentence him beneath the Sentencing Guidelines. While a defendant may not appeal a sentencing judge's refusal to make a downward departure from the Sentencing Guidelines, review is available for a sentencing challenge based upon the judge's belief that he had no authority to depart from the Sentencing Guidelines range.[11] *United States v. Fossett*, 881 F.2d 976, 979 (11th Cir.1989); *see* 18 U.S.C. § 3742(a)(1), (2); *United States v. Wright*, 895 F.2d 718, 720 (11th Cir.1990) (per curiam).

King's argument is without merit because the trial judge sentenced codefendant Thom below the Sentencing Guidelines range, an obvious indication that the judge was cognizant that he could give a lesser sentence than the Sentencing Guidelines specify. Additionally, we note that King's assistance to the authorities apparently did not warrant a government motion under Sentencing Guidelines § 5K1.1 for a downward departure, since that motion was not made.[12]

■■■ Second, King contests the calculation of his sentence under the Sentencing Guidelines because he contends that a greater amount of cocaine than he actually transported was used in determining his sentence. Affording deference to the opportunity of the district court to determine the credibility of witnesses and its application of the Sentencing Guidelines to the facts, we review an appeal from a sentence imposed under the Sentencing Guidelines by the clearly erroneous standard.[13] 18 U.S.C. § 3742(e); *United States v. Scroggins*, 880 F.2d 1204, 1206 n. 5 (11th Cir. 1989), *cert. denied*, ─── U.S. ───, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). Specifically, under the Sentencing Guidelines, the trial

11. In accordance with 18 U.S.C. § 3553(b), a sentencing court has discretion to depart from the Sentencing Guidelines range in a case which presents aggravating or mitigating circumstances "of a kind, or to a degree" not adequately considered by the Sentencing Commission in formulating the Sentencing Guidelines and that should result in a different sentence. *See* Sentencing Guidelines § 5K2.0.

12. The symmetrical statutory appellate process allows a defendant to appeal a sentence exceeding the Sentencing Guidelines, and the government to appeal a sentence below the Sentencing Guidelines. 18 U.S.C. § 3742(a)(3), (b)(3); *Wright*, 895 F.2d at 720.

13. A defendant's sentencing appeal based on 18 U.S.C. § 3742(a)(2), an incorrect application of the Sentencing Guidelines, can arise from three separate complaints regarding the sentencing. *United States v. Scroggins*, 880 F.2d 1204, 1206 n. 5 (11th Cir.1989), *cert. denied*, ─── U.S. ───, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). First, the defendant can claim that the sentencing court misinterpreted the Sentencing Guidelines in determining his sentence, raising a pure legal question for appellate review. *Id.* Second, the defendant may challenge whether the facts found by the district court warrant the application of a particular guideline, presenting a mixed question of fact and law for review. *Id.* Third, the defendant may contend that the district court made erroneous factual findings at the sentencing hearing and, consequently, applied the Sentencing Guidelines incorrectly, creating a pure factual question for review. *Id.*

judge's determination of whether a defendant is a "minor" or "minimal" participant is a factual finding subject to the clearly erroneous standard. *United States v. Alston*, 895 F.2d 1362, 1369 (11th Cir.1990); *see* Sentencing Guidelines § 3B1.2; *United States v. Taxacher*, 902 F.2d 867, 873 (11th Cir.1990); *United States v. Erves*, 880 F.2d 376, 381 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989). "A defendant may be found guilty of conspiracy even if he did not join it until after its inception, and even if he played only a minor role in the total scheme." *United States v. Roper*, 874 F.2d 782, 787 (11th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 189, 107 L.Ed.2d 144; — U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989) (citing *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981)). All that is required to sustain a conspiracy conviction is that the evidence demonstrates that the defendant knew the essential objective of the conspiracy; knowing all the details of the conspiracy or playing more than a minor role is not necessary for conviction. *United States v. Walker*, 720 F.2d 1527, 1538 (11th Cir. 1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984); *see United States v. Carter*, 760 F.2d 1568, 1582 (11th Cir.1985) (A conspirator need not be privy to all the details of the conspiracy, aware of all the other conspirators, or participate in every stage of the conspiracy in order to have his conviction upheld.); *United States v. Garcia*, 721 F.2d 721, 725 (11th Cir.1983) (A leadership role is irrelevant, "an individual cannot escape criminal responsibility merely because he played a minor role in the conspiracy.").

■ Based upon culpability, the Sentencing Guidelines § 3B1.2 commentary defines and illustrates a "minimal" or "minor" participant in any criminal activity, enabling the district court to give a convicted defendant a downward adjustment in sentencing:

1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

2. It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

Sentencing Guidelines § 3B1.2, Commentary, Application Notes 1, 2. Depending on his culpability, a drug courier is not necessarily a minor or minimal participant within the meaning of the Sentencing Guidelines. *United States v. Velasquez*, 868 F.2d 714, 715 (5th Cir.1989); *United States v. Gallegos*, 868 F.2d 711, 713 (5th Cir.1989); *see United States v. Buenrostro*, 868 F.2d 135, 139 (5th Cir.1989) (A one-time courier of eighteen kilograms of cocaine was not a minimal participant; "§ 3B1.2 turns upon culpability, not courier status." A defendant "may be a courier without being substantially less culpable than the average participant."), *cert. denied,* — U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990).

■ King was convicted of conspiracy to import 162 kilograms of cocaine. He was sentenced under the Sentencing Guidelines formula for only the fifty kilograms with which he was directly involved, and he was given the minimum sentence for that amount. Obviously, the district court did consider King's culpability in sentencing him and we cannot find that his sentence was clearly erroneous given the record evidence of his knowledge and involvement in the subject Panamanian cocaine importation operation.

D. Conclusion

For the reasons stated above, we AFFIRM the rulings of the district court and

the convictions of defendants-appellants Oscar Smith, Regina Smith and Gary King.